Freddy **MARTINEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 07–84–0311–CR.

Court of Appeals of Texas, Amarillo.

Oct. 25, 1985.

Paul A. Berlanga, Lubbock, for appellant.

Jim Bob Darnell, Dist. Atty., Ruth Cantrell, Asst. Dist. Atty., Lubbock, for appellee.

Before DODSON, COUNTISS and BOYD, JJ.

BOYD, Justice.

Appellant Freddy Martinez brings this appeal from his conviction of attempted murder and the consequent jury-assessed punishment of twenty years confinement in

the Texas Department of Corrections and a fine of $2,500. In one ground, appellant asserts that the evidence is insufficient to support his conviction. We affirm the conviction.

In the indictment it was alleged that on or about October 8, 1983, appellant:

did then and there with the specific intent to commit the offense of murder did then and there attempt to intentionally and knowingly cause the death of an individual, Robert Weikert, by stabbing the said Robert Weikert in the back with a knife, said attempt amounting to more than mere preparation that tends but fails to effect the commission of the offense intended....

Since there was no direct testimony that appellant stabbed Robert Weikert, appellant contends that this case is purely circumstantial and the State has failed to carry its burden to establish appellant's guilt. This contention requires us to review the evidence in the case.

On October 7, 1983, the complainant Robert Weikert, his friends, Eddie Estes and Roy Helmstetler, and his wife Freddice Weikert went bowling. After they finished bowling, Robert, Estes, and Helmstetler obtained a keg of beer and took it to former coworker Jimmy Howard's house for Howard's birthday party. Freddice went to Howard's house with Steve Henry and Sherry Shank. They arrived at Howard's house shortly after midnight.

When Robert and his friends arrived, Howard was not there but several other people were present, including Howard's brother who was passed out. Robert said that they put the keg on the tailgate of Helmstetler's pickup, offered beer to those present, and started drinking. Several Mexican men came to the rear of the pickup and started drinking beer too. After approximately ten to fifteen minutes, Howard arrived and stayed there about ten minutes before leaving to take his girlfriend home. Then Robert's group decided to leave, and Estes moved the keg into the pickup.

Robert testified that he heard the Mexican men say something to Estes and saw them throw beer on him. He said that the Mexicans felt that he and his friends were too good to drink with them. Robert had turned to tell Helmstetler to get in the pickup when he felt something hard in his back that felt like a "punch." He walked to the front of his pickup to tell his wife to leave and realized that he had been stabbed. After telling his wife to leave, he ran to the pickup and was taken to the hospital. He said that he had blood all over his shirt and hands. Robert identified appellant as one of the Mexican males at Howard's house that morning.

When Freddice arrived, she told her husband that she was there and then talked to Steve and Sherry and other friends at the side of the pickup. She testified that several Mexican men joined her husband, Helmstetler and Estes at the rear of the pickup and drank beer with them. Freddice saw Howard once at the rear of the pickup. She said that Estes passed out cups to the Mexican men so they could get a beer before they left with the keg. One of these men asked if they were too good to drink with them.

Appellant then threw beer at Estes, and the remaining men also threw their beer on Estes. Freddice said she saw appellant holding a knife at his right side. She described the blade as being curved with a tip, about a half inch in width and three to three and a half inches wide, and similar to a buck knife. Robert told her to get in the car and she complied.

Within one to five minutes after Freddice saw the knife, she observed Robert in the headlights of the pickup and noticed that he was bleeding. Robert, who admittedly had been drinking, said that he had been stabbed. She was then taken by Tommy Gaut to a convenience store where she called police. She and Gaut waited for the police a short distance from Howard's house. When the police arrived, she went to the house and, upon looking for appellant, told the officer that he was not there. The man who had been standing next to

appellant at the party became belligerent and was handcuffed by police. He denied knowing appellant but she later learned that he was Dominque Martinez, appellant's brother.

Freddice stated that she did not see appellant stab her husband, but only saw the blade of the knife. Freddice, who was not drinking, stated that their group had done nothing to incite the men. As far as she knew, no one in their group had any weapons.

Eddie Estes testified that when they arrived at Howard's house, there were about five to ten Mexican males present. Estes said that they were told that Howard was not present but that he would return in a few minutes. After being invited to stay, they remained and drank beer. Estes testified that appellant made racial slurs in his and Helmstetler's presence. After Howard returned and then left, they also decided to leave.

Estes stepped into the pickup bed and told everyone to get a beer since they were leaving. He said everyone obtained a beer without hesitation. Appellant, the last to obtain a beer, said, "What's the matter? Don't you white boys like to drink beer with us?" Appellant then threw his beer on Estes, and the remaining men also threw their beer on him.

Estes said that Robert, who was at the rear of the pickup, turned and started to the front when appellant said something to Robert. When Robert turned around, appellant made a fist and acted like he was going to hit him. Robert held up his hands defensively, and appellant put his right hand in Robert's back. Estes said that he didn't see anything in appellant's hand. Appellant then stepped to the rear of the pickup and, speaking to Estes, said, "Come on, big boy, you want some of it?"

Robert turned around and told his wife to get in the car and leave. He also said that he had been stabbed. As Robert walked in front of the headlights, Estes saw that Robert was bleeding. He, Estes, testified that no one was near Robert before he was stabbed except appellant and

that they had not made any threatening gestures to the Mexican males.

Dr. John Griswold examined Robert's wound on October 8, 1983 in the emergency room of Lubbock General Hospital. Griswold described the wound as a "stab" wound and measured its width approximately one-half inch wide. Later, upon performing surgery, he discovered that the spleen and abdomen had been penetrated. Based upon the surgery, he said that the knife had a fine point and he estimated that the wound was about four inches deep. Griswold said that a four inch stab wound similar to Robert's injury could have been caused by a three to three and a half inch knife if the blow was of such force to have indented the skin. Griswold said that the wound was about two inches above the left kidney, an inch and a half from the spine, and near the stomach and adrenal glands. In his opinion, the object was clearly capable of causing death or serious bodily injury.

■ Recently, the Court of Criminal Appeals ruled that specific intent to kill is a necessary element of attempted murder. Hence, an attempted murder can only be committed by a person who has the specific intent to commit or complete the offense of murder, *i.e.*, the intent to kill. *Flanagan v. State*, 675 S.W.2d 734, 741–42 (Tex.Crim. App.1984) (opinion on motion for rehearing). A trier of the facts may infer intent to kill from any facts in evidence which, to his mind, prove existence of such intent to kill. *Walker v. State*, 440 S.W.2d 653, 657 (Tex.Crim.App.1969). For example, specific intent to kill may be inferred from the use of a deadly weapon. *Id.; Bell v. State*, 501 S.W.2d 137, 138 (Tex.Crim.App.1973). Although a knife is not a deadly weapon per se, it can qualify as a deadly weapon by demonstrating the manner of its use, its size and shape, and its capacity to produce serious bodily injury or death. *Hawkins v. State*, 605 S.W.2d 586, 588 (Tex.Crim.App. 1980); *Boazman v. State*, 501 S.W.2d 894, 896 (Tex.Crim.App.1973); *Williams v. State*, 477 S.W.2d 24, 25 (Tex.Crim.App. 1972).

In determining whether there was sufficient evidence to show that the knife in question was a deadly weapon, again we must review the pertinent evidence. Dr. Griswold testified that the object used to cause complainant's injury was clearly capable of causing death or serious bodily injury. He testified that the wound was about one-half inch wide, four inches in depth, and was near several vital organs. Freddice described appellant's knife as one-half inch wide and three to three and a half inches in length, and she termed it a buck knife. Robert received a serious injury requiring exploratory surgery and a week in the hospital. Freddice and Estes said that Robert was bleeding seriously. Applying the appropriate criteria to the instant case, the evidence is amply sufficient to show that the injury was produced by appellant's knife, and the jury, as the trier of fact, could reasonably conclude that it was a deadly weapon.

In determining whether the evidence is sufficient to support a conviction for the offense charged, the applicable standard of review is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). *See also Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex.Crim.App.1983) (opinion on motion for rehearing). That standard is the same in both direct and circumstantial evidence cases and, in making its review, the appellate court will look at all the evidence in the light most favorable to the verdict or judgment. *Houston v. State*, 663 S.W.2d at 456.

The jury is the sole judge of the credibility of the witnesses and may accept or reject any part or all of the testimony given by State or defense witnesses. *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim.App.1978). It is not necessary that every fact directly and independently point to the accused's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Flores v. State*, 551 S.W.2d 364, 367 (Tex.Crim.App.1977). While presence at the scene of an offense, without more, is insufficient to support a conviction, it is a circumstance which, taken in connection with other facts, may be sufficient to show that a defendant is guilty. *Thompson v. State*, 563 S.W.2d 247, 250 (Tex.Crim.App.1978). It is in the light of this litany of rules that we review the evidence in this case.

In the instant case, the evidence showed that: (1) appellant made racial slurs to some of the Weikert group before the stabbing; (2) appellant was the first to throw beer on Estes and to suggest that the Weikert group was too good to drink beer with them; (3) appellant was the only one known to have possessed a knife; (4) appellant was the only one who got near Robert Weikert and put his hand in his back; (5) appellant raised his hand as if to hit the complainant before he was stabbed; (6) the other group surrounded appellant as if to hide something after he put his hand in Weikert's back; (7) after Weikert was stabbed, appellant said to Estes, "Come on, big boy, you want some of it?"; (8) appellant left Howard's house shortly after the stabbing; (9) appellant's brother denied that he knew appellant; and (10) the knife described by Freddice was consistent with the size of complainant's wound according to Griswold.

Under this analysis, the evidence is sufficient for the jury to conclude that appellant had the specific intent to kill Robert Weikert. A rational jury could have found that the action of appellant showed that it was his "conscious objective or desire" to cause the death of Robert Weikert. Furthermore, this conclusion may be inferred from the manner in which the knife was used against the complainant. Appellant's ground of error is overruled.

There being no reversible error, the judgment is affirmed.