COMMONWEALTH vs. JOHN SHEA.

Middlesex.  April 8, 1986. — August 18, 1986.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Supreme Judicial Court,* Further appellate review. *Assault with Intent to Murder. Intent. Practice, Criminal,* Instructions to jury, Sentence. .

The action of the Supreme Judicial Court in granting the Commonwealth's application for leave to obtain further appellate review of a criminal defendant's conviction, which had been reversed by the Appeals Court, did not operate as a grant of leave to the defendant to obtain further appellate review of a separate, albeit related, conviction, which the Appeals Court had affirmed. [265]

At the trial of an indictment for armed assault with intent to murder, the judge's unobjected-to instructions on intent, although erroneous in that they impermissibly equated the concepts of malice aforethought and specific intent to kill, created no substantial risk of a miscarriage of justice, since the only contested issue at the trial was whether it had been the defendant, or a person arrested with him, who had stabbed the victim in the chest. [267-270]

At a criminal trial, an example used by the judge in explaining how the jury might draw an inference from circumstantial evidence was permissible and did not suggest that the judge believed that the defendant was guilty. [270-271]

The evidence at the trial of an indictment for armed assault with intent to murder was sufficient to enable the jury to conclude beyond a reasonable doubt that the defendant, and not a second person who was taken into police custody with the defendant, had stabbed the victim in the chest. [271]

The record of a criminal trial gave no support to the defendant's contentions that the sentencing process had been improperly influenced or was otherwise unfair. [271-272]

INDICTMENT found and returned in the Superior Court Department on May 31, 1983.

The case was tried before *Hiller B. Zobel,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Andrew Silverman,* Committee for Public Counsel Services, for the defendant.

*Pamela L. Hunt,* Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. After a jury trial, the defendant was convicted of armed assault with intent to murder, assault and battery by means of a dangerous weapon, and disorderly conduct. The judge sentenced the defendant to two concurrent six to ten year terms on the armed assault with intent to murder conviction and the conviction of assault and battery by means of a dangerous weapon. The judge ordered the disorderly conduct conviction placed on file. The defendant appealed. The Appeals Court issued an order reversing the judgment on the armed assault with intent to murder indictment and affirming the judgment on the assault and battery by means of a dangerous weapon indictment. *Commonwealth* v. *Shea,* 21 Mass. App. Ct. 1101 (1985). On November 25, 1985, we denied the defendant's application for further appellate review of the assault and battery by means of a dangerous weapon conviction. 396 Mass. 1104 (1985). On January 31, 1986, we granted the Commonwealth's application for further appellate review of the assault with intent to murder conviction. 396 Mass. 1105 (1986).

"Unless we direct otherwise in our order granting an application for further appellate review, all issues that were before the Appeals Court are before this court, including issues not addressed in the application." *Commonwealth* v. *Burno,* 396 Mass. 622, 623 (1986). In our order granting the Commonwealth's application for further appellate review of the assault with intent to murder conviction, we did not direct that our review would be limited to the issues addressed in the Commonwealth's application. Therefore, all issues that were before the Appeals Court bearing on that conviction are before this court. However, *Commonwealth* v. *Burno, supra,* should not be understood as stating that, unless otherwise directed, our grant of further appellate review of one conviction operates as a grant of further review of a separate, albeit related, conviction. Therefore, we again deny the defendant's request that we review his conviction of assault by means of a dangerous weapon.

Our review is limited to the conviction of assault with intent to murder and, contrary to the order of the Appeals Court, we affirm that conviction.

We summarize the evidence presented at trial. In the early morning hours of November 7, 1982, Jeffrey Thyng went to the Thunderbird Country Club in Tyngsborough where he socialized with friends until the club closed at approximately 2 A.M. As Thyng was leaving the club, he was approached by the defendant and Bradford Couronis. Couronis made a derogatory remark to Thyng and Thyng made a similar statement in reply. After this brief exchange, Thyng walked into the parking lot to catch up with Susan Landry and Cindy Schalk, who earlier had agreed to give Thyng a ride home. The defendant and Couronis followed Thyng across the parking lot and, as Thyng, Landry and Schalk reached the crest of a hill, the defendant and Couronis confronted Thyng.

Indicating displeasure with Thyng's earlier statement, Couronis and the defendant began shoving Thyng. Thyng tried to retreat and protect himself but the altercation continued. Couronis pushed Thyng in the chest and Thyng fell to the ground, breaking his right hand. While Thyng was on the ground, the defendant and Couronis kicked him. During the ensuing scuffle, Thyng felt two or three thumps on his chest after which he blindly reached up and grabbed the full beard of a man to his right. There was testimony that the defendant had a full beard on the night of the fight. Couronis was described as having facial hair of about a week's growth. Thyng testified that it was the defendant's beard that he grabbed, and that the thumps he felt prior to grabbing the defendant's beard were the only applications of force to his chest other than Couronis's initial push that sent him to the ground. Some two minutes after he felt the thumps to his chest, Thyng stood up, discovered he was bleeding from the chest and that his yellow sweater was completely red, and fell to the ground, where he "played dead." Later it was discovered that Thyng had been stabbed once in the chest. Neither Thyng nor any other witness, however, could identify which of the two men stabbed him.

At some point during the altercation, Schalk ran to find a police officer, and Tyngsborough police officer Michael Coulter, who had been on duty that night at the club, responded. After Officer Coulter observed Thyng lying on the ground with "blood pumping from his chest . . . four to five inches," he and another officer pursued the defendant and Couronis as they ran away from the scene of the fight. As the two men approached a red pickup truck, Officer Coulter observed the defendant throw a very small object to Couronis. Coulter testified that he did not observe Couronis discard anything during the pursuit. Couronis was apprehended attempting to enter the driver's side of the truck and the defendant was taken into custody on the opposite side of the vehicle. The officers then searched the two men. They discovered no weapons on Couronis, but the officers found an unbuckled sheath on the defendant's belt which contained a knife. The knife was covered with blood.

Officer Coulter returned to the place where Thyng was lying. He noticed a large pool of blood under Thyng and blood all around him on the ground. At the police station, the defendant was advised of his Miranda rights. After he was informed of his rights, the defendant pointed to an object on a desk and stated, "That's my knife. What are you doing with it?" When asked why there was blood all over the knife, the defendant replied, "I don't know." Blood was observed all over the insides of the defendant's hands, inside the right sleeve of his coat, on his right arm, and on his belt. Blood was also detected on Couronis's jersey, undershirt, jeans, and sweatshirt. He had no blood on his hands or arms. At a hospital that night, Thyng identified the defendant and Couronis as his attackers.

1. *Jury Instructions.*

The defendant argued in the Appeals Court that reversal of the assault with intent to murder conviction was required because the judge incorrectly instructed the jury with respect to the intent required for that crime and because the judge's explanation of circumstantial evidence unfairly assisted the Commonwealth's case. The defendant did not object to either aspect of the judge's charge. In its unpublished memorandum, the

Appeals Court, viewing the judge's charge on intent to murder in light of *Commonwealth* v. *Henson*, 394 Mass. 584, 590-592 (1985), and *Commonwealth* v. *Ennis*, 20 Mass. App. Ct. 263, 264-269 (1985), held that the judge's instruction was erroneous because it "did not make clear that a necessary element to be proved on a charge of assault with intent to murder is 'an actual, subjective intent . . . of the defendant to kill,' an intent 'far more specific than that implied by the general concept of malice,' " quoting *Ennis, supra* at 265.

The Commonwealth argues that the Appeals Court incorrectly applied the holding of *Commonwealth* v. *Henson, supra*, in concluding that a conviction of assault with intent to murder requires a finding of a specific intent to kill. *Henson*, according to the Commonwealth, articulated a new rule and, as such, that rule should not have been applied to the defendant's trial, which had taken place before *Henson* was decided. In *Commonwealth* v. *Ennis, ante* 170 (1986), we expressly rejected the position now taken by the Commonwealth. Our decision in Ennis is controlling here.

We agree with the Appeals Court that the judge's instruction on intent to murder was erroneous. Although, at the outset of the case the judge explained to the jury that the Commonwealth must prove that the assault was "with the formed mental idea not merely of doing harm, but of murdering, of killing," in his final instructions to the jury the judge impermissibly equated the concepts of malice aforethought and specific intent to kill. The relevant portion of the judge's charge is set forth in the margin.[1] Viewed as a whole, the judge's charge inadequately conveyed to the jury that a conviction for armed assault with intent to murder requires a finding of actual, subjective intent to kill.

_____

[1] "Now if the threat is made with a dangerous weapon, . . . then that's an assault with a dangerous weapon, an assault while armed. If the assault while armed is made with the intent to commit murder, then the offense is complete; that is to say, if the Government proves . . . not only the assault with the dangerous weapon, but the assault with intent to murder, then the Government will have proved its case.

"There are three elements, the assault, the dangerous weapon and the intent to murder. 'Intent' means a mental decision to commit murder. Not a mental decision just to wound somebody, not a mental decision just to

The Commonwealth argues that, even if the judge's instruction was erroneous, the defendant's conviction for armed assault with intent to murder should be affirmed because the judge's error did not create a substantial risk of a miscarriage of justice. We agree. Contrary to the defendant's present assertion that his mental state on the night of the attack was a "central feature" of his defense at trial, and that therefore the erroneous instruction on that issue created a substantial risk of a miscarriage of justice, a review of the record clearly demonstrates that the theory of the defendant's case was that it was Couronis, not he, who stabbed Thyng. Thus, identification of the man who stabbed the victim was the only live issue at trial.[2] We are aware that a defendant's theory of his case cannot relieve the Commonwealth of its burden of proving every element of a crime beyond a reasonable doubt. Nevertheless, whether the issue of intent was contested at trial is highly relevant to our determination whether the error in the judge's charge prejudiced the defendant. *Commonwealth* v. *Gabbidon, ante* 1, 5 (1986). *Commonwealth* v. *Puleio,* 394 Mass. 101, 109 (1985). *Commonwealth* v. *Lee,* 383 Mass. 507, 512-513 (1981).

Not only did the defendant refrain from contending at trial that the assailant lacked any intention to kill, but also the evidence fully supports a conclusion that whoever stabbed

---

scare somebody, but a mental decision to commit murder, which is defined — murder is defined *as the killing of a human being with malice aforethought. What the crime of murder encompasses is the killing of a human being without justification or excuse with the intent to inflict injury, and the death then resulting from the infliction of the injury.*

"So that if the Government proves, in addition to the assault and the dangerous weapon, that there was in . . . [Shea'] mind . . . *an intent to inflict an injury, the sort that a reasonable person would or should understand would result in serious injury* or death, then in that case, the Government, if . . . [it has] proved those things beyond a reasonable doubt, has proved the offense of assault, armed with a dangerous weapon with intent to murder." (Emphasis added.)

[2] In their verdict on the charge of armed assault with intent to murder, the jury found the defendant guilty as a "principal" as opposed to a "joint venturer," thus there is no danger that the issue of shared intent was important to the verdict.

Thyng intended to kill him. The seriousness of the wound disclosed by the evidence was inconsistent with any intent other than an intent to kill. Officer Coulter, who administered first aid to Thyng at the scene, described the wound as an inch long and as "opened up . . . sucking air into the chest cavity." He described blood "pumping from [Thyng's] chest . . . four to five inches." Thyng had bled from the chest, a vital area, profusely. Therefore, no harm accrued to the defendant from the jury charge on the mental state required for assault with intent to murder.

The other aspect of the jury instructions challenged by the defendant involves the judge's illustration of what constitutes an inference.[3] The defendant argues that the judge's illustration so closely paralleled the facts of the case that that instruction,

---

[3] "There's another kind of evidence. Sometimes it's called inferential evidence; sometimes it's called circumstantial evidence. It's different from direct evidence because there is a process that intervenes between the perception of the fact and the evidence. Circumstantial evidence is evidence that leads you to a conclusion on the basis of your thinking about the facts.

"Let me give you an illustration far removed from the facts of this case. Let's suppose that a family, my family, has chocolate cake for dinner. And let's suppose that we have a rule in the family that after dinner, nobody gets any snacks, have dessert, and then the meal is finished. Let's suppose that on a particular day the chocolate cake was just half finished so that there's a semi-circle, if you will, of cake that's left. It's put on the kitchen counter with the glass bell over it, and it's left until tomorrow. Let's suppose that at ten, ten-thirty, I come down to close things up; and what do I see? The bell is off the cake plate. There's less than half a cake left. It looks like a wedge of cake has been taken out. There's a plate in the sink that has some fudge icing and crumbs on it, and there's one of the young gentleman [*sic*] of the household standing at the sink just putting down a fork that looks as though it's had some chocolate cake on it, and he's got a smear of chocolate on his cheek, and he has crumbs on his shirt, and he has a look of sheepish embarrassment on his face.

"Now, notice, I did not see him eat the chocolate cake; but putting everything together, the missing piece, the plate, the crumbs, the fudge icing, the mark on his cheek, the crumbs on his shirt, the look on his face, putting all that together, using my brain, I conclude that he took a piece of chocolate cake. I didn't see him, but I conclude it, and I think you would probably conclude also that he had eaten a piece of chocolate cake.

"Notice the process. The facts, what I saw, plus thinking, equals conclusion. That's what circumstantial evidence is all about. It's nothing any more complicated than that. You consider facts. You apply your thought to those facts, and you reach a conclusion."

combined with the judge's assurance that he, and probably the jury also, would conclude guilt on the facts of his scenario, "had the effect of throwing the judge's opinion onto the scale decisively against the defendant." The Appeals Court discerned no improper parallel between the illustration used by the judge and the facts of the case, and we agree. The defendant relies on *Commonwealth* v. *Pomerleau*, 10 Mass. App. Ct. 208 (1980), but the judge's illustration of an inference in this case is not analogous to the reasonable doubt illustration condemned in that case. The jury in this case could not reasonably have believed "they were being told that any doubt they had of the defendant's guilt would be unreasonable." *Id.* at 214. The use of an illustration to explain an inference in connection with the concept of circumstantial evidence is permissible. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 484 (1980).[4]

2. *Motion for Required Finding of Not Guilty.*

The defendant argues that the judge should have granted his motion for a required finding of not guilty because the evidence was insufficient to warrant a conclusion that he stabbed Thyng. However, the evidence clearly permitted a finding by the jury that the defendant stabbed Thyng. The knife apparently used in the stabbing was found on the defendant's person minutes after the fight. Thyng testified that it was the defendant he grabbed immediately after feeling the thumps to his chest. Also, after the two men were taken into custody, large quantities of blood were observed on the defendant's right arm and hand, while no blood was detected on Couronis's hands and arms. The Appeals Court correctly concluded that the judge did not err in failing to order a required finding of not guilty on the charge of armed assault with intent to murder.

3. *Sentencing.*

The defendant raises two arguments with respect to sentencing which require little discussion. He suggests that the judge's sentencing decision was somehow influenced by the Common-

---

[4] Because we conclude that the judge's use of the illustration was not error, we need not address the defendant's contention that trial counsel's failure to object to the judge's use of the illustration constitutes ineffective assistance of counsel.

wealth's mention in its sentencing memorandum that Thyng had received a death threat from a member of a club to which the defendant had once belonged. However, the defendant points to nothing to indicate that the judge was influenced by that information. The judge rejected longer sentences recommended by the Commonwealth and, in explaining his reasons for the sentences he imposed, he said nothing about the supposed death threat.

The defendant's second challenge to the sentencing, from which appellate counsel disassociates himself in accordance with *Commonwealth* v. *Moffett*, 383 Mass. 201, 208 (1981), concerns the judge's request prior to sentencing for information about the disposition of any charges brought against Couronis. The defendant maintains that the judge already had that information and that therefore his request for it amounts to an untrue statement, rendering the sentencing process unfair. There is no basis in the record for the defendant's assertion, and we reject it.

*Judgment of the Superior
Court affirmed.*