COMMONWEALTH vs. JOHN FIDLER.

Suffolk.   October 10, 1986. — February 17, 1987.

Present: KASS, KAPLAN, & FINE, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Assault with Intent to Murder. Joint Enterprise. Intent. Practice, Criminal,* Preservation of evidence, Severance. *Evidence,* Cross-examination.

At the trial of a defendant who had been singled out from a group of assailants and identified after a knife attack on three victims, the evidence as to two of the victims was sufficient to support a verdict of guilty of assault and battery by means of a dangerous weapon on a joint venture theory, where the jury were warranted in finding that the attackers consciously acted together in carrying out the criminal enterprise. [512-513]

At the trial of a defendant on charges of assault and battery by means of a dangerous weapon arising out of a knife attack by a group of assailants upon three victims, the evidence as to one of the victims was sufficient to prove the defendant's guilt on a direct basis as well as on a theory of joint venture. [513-514]

Although the judge's unobjected-to instructions to the jury at the trial of an indictment charging assault with intent to murder left doubtful whether the specific intent required for the crime was an intent to kill, no substantial risk of a miscarriage of justice was created thereby, where the only live issue for the jury was the identity of the assailant and where, moreover, the evidence adduced as to the weapons used, the wounds inflicted, and the deliberation manifested in the assault on the victim negated any substantial risk of a miscarriage of justice. [514-515]

In a criminal proceeding the defense made no showing that certain items lost, or supposedly lost, while in the custody of the Commonwealth would have been exculpatory or that any prejudice to the defendant resulted from the absence of these items. [516]

At the trial of indictments for assault with a dangerous weapon and assault with intent to murder, the judge correctly precluded defense counsel, during cross-examination of one of the victims, from asking him whether he was a marihuana user. [516-517]

Charges against a single defendant arising from a vicious assault upon three victims by the defendant in company with several other assailants were properly tried together. [517]

INDICTMENTS found and returned in the Superior Court Department on January 6, 1984.

The cases were tried before *John D. Sheehan,* J.

*John F. Cullen* for the defendant.

*Margaret Steen Melville,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. For the stabbings of Julie Greene, John Hennessy, and Stephen Celata in the early morning of Friday, July 15, 1983, the defendant, John Fidler, was indicted on three charges of assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A[*b*]), and three charges of armed assault with intent to murder (G. L. c. 265, § 18[*b*]). After extended trial to a jury, Fidler was convicted of the assault and battery by means of a dangerous weapon upon all three victims; he was convicted of the armed assault with intent to murder upon Julie Greene, but acquitted of that offense as regards John Hennessy and Stephen Celata. Fidler was sentenced to a term of fifteen to twenty years for the more serious crime against Greene, and, to run concurrently with that sentence, terms of five to seven years for the other crimes of which he was convicted. The main errors claimed are in the judge's denial of a motion at the close of the Commonwealth's case for a required finding of not guilty on all the counts, and in the denial of the motion, renewed at the close of all the evidence, in respect to the counts involving victims Hennessy and Celata. We affirm.

Following is an account of the case as the jury could see it. Lisa Buccieri left her home in West Roxbury about 9:30 P.M., July 14, and drove to Roslindale to pick up her friends Julie Greene and Gail Crosby. The party went to Charlie's bar in West Roxbury to greet a friend of Greene's, remained there for perhaps fifteen minutes, and then proceeded to Shawn's, a popular "action bar" on Chatham Street in the Quincy Market neighborhood of Boston, arriving some time after 11:00 P.M. The party had in mind meeting a young man from Cape Cod, but he was not at Shawn's. Present, however, were Hennessy and Celata, Roslindale residents well acquainted with Greene, and the young women socialized with them and others during the evening, punctuated with drinking and dancing.

Two noteworthy incidents occurred at Shawn's. Hennessy was accosted by a young man, whom he described as short, thin, and blond, wearing a green "tank" or "muscle" shirt (sleeves cut off at the shoulders), imprinted with "Charlestown Townies" and a figure of the Bunker Hill Monument. The man said, "Tell your friend he better watch out." Hennessy did not know the man and knew no reason for the threat. Again, shortly before closing time, say around 1:45 A.M., Lisa Buccieri was spoken to by a young man, thin, scarred face, broken teeth, wearing a green shirt. His arm was in a sling. Buccieri found his repetitious attempts to pick her up offensive, and rebuffed him sharply. Buccieri also saw at Shawn's that night a young man matching Hennessy's description of the fellow who uttered the threat, and in addition, a youth who, from her own and converging testimony by others, may be described as six feet, one or two inches, about 200 pounds, with sandy blond or brown hair, football build, wearing a pink or peach polo shirt and khaki or beige pants. Gail Crosby saw all three men mentioned. The witnesses Patrick K. Sullivan and Kevin Kelly, workers at Shawn's who were present on the night, confirmed that the man with the arm sling was at the bar and his name was John Awbry. Sullivan had seen the large man outside Shawn's about twenty yards from the entrance; his name was John Fidler. Kelly had seen the man with the tank shirt at the entranceway; his name was Warren Fitzpatrick. The proprietor of Shawn's, Shawyn Driscoll, said he saw Fitzpatrick leaving Shawn's as he, Driscoll, went in about 12:45 A.M. It was common ground that the three men were companions living in Charlestown. Some byplay in the evidence about the presence of the defendant Fidler at the bar — he was eighteen at the time and not eligible for admission — is recorded in the margin.[1]

---

[1] Detectives Charles M. Carroll and Charles P. Gleason testified that Sullivan and Kelly told them when interviewed that all three men were at the bar; Gleason added that Kelly and Sullivan told them Fidler was wearing a pink shirt. As noted in our text, Sullivan at trial placed Fidler outside Shawn's but close aboard. Driscoll testified that he had given orders that the defendant, and Awbry as well, should be excluded from the premises

About 1:45 A.M., as Shawn's was closing down, Lisa Buccieri and Gail Crosby left with Dennis Miller and another man with whom they had been chatting. They turned left, that is, west on Chatham Street, and walked less than a block to the perpendicular intersection of that street with Chatham Row, an alley running south to State Street, which was parallel to Chatham Street. There was a lighted parking lot fronting on the westerly side of Chatham Row and some distance on the northerly side of State Street. The party of four crossed Chatham Row onto the parking lot and stood there, one or the other leaning or sitting on the hood of a parked car.

Julie Greene and her friends Hennessy and Celata left Shawn's a little after the party of four, but passed them. Greene intended to accompany these men to their car on or about Broad Street, which runs south from its perpendicular intersection with State Street; the intersection is at a place on the opposite side of State Street from the parking lot and a little to the west of it. Greene and the two men made their way to the State-Broad Street intersection and evidently began to enter Broad Street, with Celata perhaps a little ahead of Hennessy and Greene some steps behind Hennessy. Instantly without warning, they became the objects of a vicious attack which ended in near deaths.

Perhaps five or seven men came upon them in this poorly lighted place. A large man, two hundred pounds, over six feet, came at Celata from the left and "punched" him three times; the punches were in fact two strikes in the abdomen with a sharp instrument and one in the arm. Celata fell. He heard Greene behind him saying something like, "What's going on over there," saw Hennessy moving to help him, but then falling down. Hennessy, in turning to help Celata, saw the man in the tank shirt who had spoken the warning earlier. He saw a large man, over six feet, "fatty" build, in a bright pink shirt. He "passed out" from repeated stabbings — one in the stomach,

as bad actors. But Kelly knew of no such order from Driscoll, nor did Edward Gillespi, another worker. (Identifications of persons seeking to enter were supposedly checked at the door.)

two in the back and two in the chest — but could not swear who dealt them. He did not see what happened to Greene. Greene saw the trouble ahead, Celata "punched" and down, Hennessy bending over him and then attacked. She exclaimed, "Come on, what are you doing? Don't be assholes." Emerging from the melee and facing her was a large man in a pink shirt with light brown or blond hair. He paused, stood still, looked at her; she said, "What are you doing?" He plunged at her and struck three times. She doubled over, saw blood, staggered out to State Street, and collapsed.

Lisa Buccieri and Gail Crosby say they saw the incident from their position at the parking lot; Buccieri thought it was a "fake fight." Buccieri said she made out the three men she had noticed at Shawn's; Crosby saw the large man and the one with the tank shirt. The incident ended. After some minutes both Buccieri and Crosby saw two men walking, then running past them, evidently up Chatham Row and around the corner at Chatham Street in a westerly direction toward Houlihan's restaurant. They were the large man and the tank-shirted man. Buccieri saw the large man cover his face with his shirt as he passed; the other man made a similar movement with his hand. Buccieri shouted, "Why are you hiding your faces, there's no TV cameras here." Dennis Miller saw the incident; later he saw a couple of guys running and heard Buccieri saying something about a camera, but he didn't observe the men in detail. After going to the scene at State and Broad with the women, he ran to Shawn's to summon help.

Police cars and ambulances arrived shortly. Greene was taken to the New England Medical Center, Celata to Boston City Hospital, Hennessy to Massachusets General Hospital, all in serious condition.

On Tuesday following the incident, Greene, having been let out of intensive care, but still in quite weakened condition, was interviewed by Detectives Carroll and Gleason. She gave a description of the man who faced her squarely and attacked her — like a football player, light brown or blond hair, wearing a pink or peach shirt. She was shown pictures successively from an array of ten; upon viewing the sixth, she wept and

identified it positively as that of the large man. It was a picture of John Fidler. Three days later she went over the whole array of ten, and again identified the picture of Fidler. (At a later appearance in a courtroom, she identified Fidler among those present.)

The defense cross-examined witnesses for the Commonwealth in detail, attempting to attack (among other things) the police work in the case, the strength of the testimony of Buccieri and Crosby, and the capacity of Julie Greene to make a reliable identification. Greene testified that she was "under the influence," feeling good, as she left Shawn's; and she was weak, and under certain sedative drugs, when she first selected Fidler's picture. The defense offered a psychiatrist, Sheldon D. Zigelbaum, who tried to assess the effects of Greene's intakes of alcohol and medication on her ability to make a positive identification.[2]

1. *Substance of the offenses.* The defendant says there was such a lack of evidence tying him to the criminal events that the judge erred in denying his motion at the close of the Commonwealth's case for a required finding of not guilty of all the charges (the motion was repeated and denied at the close of all the evidence as to the crimes against Hennessy and Celata).[3] In our view there was adequate evidence. Going direct to the assaults at State and Broad, we see Fidler and his friend Fitzpatrick singled out and identified from among a somewhat larger group of persons (which may have included Awbry) who together surprised the three victims on a quiet street and attacked

---

[2] The witnesses for the Commonwealth were the three victims, Buccieri and Crosby, Detectives Carroll and Gleason, Sullivan and Kevin Kelly (workers at Shawn's), and Robert Molloy (police officer). The defense called Driscoll, Gillespi (worker at Shawn's), Dennis Miller, Richard J. Kelly (an emergency medical technician), and Zigelbaum.

[3] In ruling on the motion, a judge asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979). If the judge in the present case was right to deny the motion when first made, he was also right to deny the later, limited motion, as the proof had not "deteriorated." *Commonwealth* v. *Basch,* 386 Mass. 620, 622 n.2 (1982).

them with the use of knives. Fidler himself is placed near Hennessy when Hennessy was stabbed in the back and chest. Fidler confronted Greene and stabbed her repeatedly. Then he fled with Fitzpatrick, attempting to hide his face as he neared witnesses. A sortie of this kind involves cooperation: the assailants unite, locate their quarry, move silently to their attack, strike suddenly, and suddenly depart. The purpose of the participants was to inflict injury, evidently without limit. There can be no suggestion that Fidler (although armed with a knife) was merely present, while others, unconnected with him, carried out the criminal enterprise; Fidler was a full partner in it.

(a) *Crimes against Hennessy and Celata.* With respect to two of the charges of assault and battery with a dangerous weapon, those referring to Hennessy and Celata, it is not possible to say clearly that Fidler himself wielded the knife; his responsibility was rather accessorial, that of a joint venturer. Although the defense argued that evidence of such a venture or enterprise was lacking, or at least that Fidler's participation was unproved, and thus that an instruction on the matter was not warranted, the defense did not object to the content of the judge's instruction (twice given) on accessorial guilt. The instruction was consistent with "[t]he theory underlying joint enterprise . . . that one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal." *Commonwealth* v. *Soares,* 377 Mass. 461, 470 (1979). See *Commonwealth* v. *Madeiros,* 354 Mass. 193, 197-198 (1968); *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980); *Commonwealth* v. *Champagne,* 399 Mass. 80, 86 (1987). That the jury could find such complicity on the part of Fidler seems plain enough.

At the argument of this appeal, a question was raised about the need to show, when joint venture is claimed, that the partners had an antecedent agreement to encompass the commission of the substantive crime. The proper answer to the question can be drawn from a discussion in *Commonwealth* v. *Cook,* 10 Mass. App. Ct. 668 (1980). That was a prosecution

for conspiracy to commit rape. The essence of the crime of conspiracy is the agreement of the conspirators. This is itself a crime without regard to any criminal acts that follow. The court distinguished conspiracy from "accomplice liability," i.e., liability in joint venture. *Id.* at 674. There are cases where such liability arises without prior planning or agreement. So it has been held enough that at the climactic moments the parties consciously acted together in carrying out the criminal endeavor, each thereby becoming responsible for the acts of the others. An element of mutual assent at those moments no doubt there is, but there need not have been an anticipatory compact. See *Commonwealth* v. *Morrow,* 363 Mass. 601, 608-609 (1973); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 8-9 (1974). See also *Brown* v. *Perkins,* 1 Allen 89 (1861); *Bass* v. *State,* 172 So.2d 614 (Fla. Dist. Ct. App. 1965); *People* v. *Williams,* 104 Ill. App. 2d 329, 335-336 (1968). Contrast *Commonwealth* v. *Burrell,* 389 Mass. 804, 805-807 (1983); *Commonwealth* v. *Chinn,* 6 Mass. App. Ct. 714, 717-718 (1978).

(b) *Crimes against Greene.* Surely deserving to fail was the motion for a required finding of not guilty of the crime of assault and battery with a dangerous weapon upon Julie Greene. The considerations regarding joint venture that applied to Fidler's crimes against Hennessy and Celata apply to the like crime against Julie Greene. But the evidence in the case of Greene also proves Fidler's guilt on a direct rather than accessorial basis, a route open to the jury under the judge's instructions.

The jury found Fidler guilty of armed assault with intent to murder Julie Greene, but not guilty of that crime in respect to Hennessy or Celata. The evidence, we think, could support Fidler's accessorial responsibility with Fitzpatrick and others for that crime upon Greene;[4] but it is more likely that the jury

---

[4] A person participating with others in a ferocious attack must envision the possibility that one of the band will not merely attempt to wound but will attempt to kill. See the discussion of "conditional or contingent" intent in *Commownealth* v. *Richards,* 363 Mass. 299, 308 (1973).

found and rested upon evidence of Fidler's direct responsibility in Greene's case.

In charging the jury about the armed assault with intent to murder, the judge appears to have missed the case of *Commonwealth* v. *Henson,* 394 Mass. 584 (1985), decided shortly before the present trial; and he adopted a style which had been common, that is, he made it clear that this was a crime requiring a specific intent, but he so described "malice" in relation to "murder" as to leave doubtful whether the jury would apprehend that the requisite intent was the intent to kill.

As the defense took no objection to the charge, the question to be decided on the present appeal is whether the error, in the circumstances of the case, created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Pickles,* 393 Mass. 775, 776 (1985); *Commonwealth* v. *Ennis,* 398 Mass. 170, 176 (1986). Whether unobjected-to misdirection about this crime had created such a risk was dealt with on varying facts in *Commonwealth* v. *Gabbidon,* 398 Mass. 1, 5-6 (1986), *Commonwealth* v. *Shea,* 398 Mass. 264, 269-270 (1986), and *Commonwealth* v. *Fernette,* 398 Mass. 658, 671-672 (1986), and we follow those authorities.

In the first place, as in *Gabbidon,* the defense centered on the question whether Fidler was present at the time and place of the criminal event; that was the issue on which the defense spent itself. The following quotation from *Gabbidon,* 398 Mass. at 5, speaks to the present case as well: "Defense counsel reasonably did not object to the jury charge because whether the gunman possessed the specific intent to kill Fitzgerald was not a live issue in the case. The only live issue was the identity of the gunman. Because the erroneous instruction on specific intent to kill did not relate to an issue actively contested at trial, no substantial risk of a miscarriage of justice resulted from the erroneous portion of the jury charge. *Commonwealth* v. *Puleio,* [394 Mass. 101, 109 (1985)]." Contrast *Commonwealth* v. *Harju, post* 963 (1987).

In that view one need not consider whether there was evidence from which the jury could find that the assailant intended and attempted to kill. But that evidence was adduced. The

questions naturally asked, bearing on intent, concern the weapon used, the wound inflicted, and the deliberation manifested. Was the weapon capable of killing — compare a high powered rifle or a hunting knife with a shotgun without a sight using bird shot. Compare *Gabbidon,* 398 Mass. at 4, and *Shea,* 398 Mass. at 267, with *Fernette,* 398 Mass. at 672. How serious were the wounds — what were their number and dimensions, did they damage vital organs, what loss of blood followed, what was the need for and nature of any surgery? See *Shea,* 398 Mass. at 270. Did the assailant pause to consider his attack and was the particular victim clearly targeted (here would fall any evidence of motive)? See *Gabbidon,* 398 Mass. at 5-6.

The weapon used here, presumably a knife, was able to open wounds in Greene that indicated a width of blade of nearly an inch: the weapon was "deadly." [5] Greene was stabbed three times, twice in her upper right abdomen and once on the left side of the chest below her breast. One of the stabbings to the abdomen pierced through her gall bladder, which had to be removed. A collapsed lung necessitated further surgery. Within two hours of the attack Greene lost a third of her blood volume. She spent eleven days in the hospital, some in intensive care. The attack was studied and deliberate with Greene in clear view: Fidler stepped out of the melee, approached Greene, looked at her for several seconds, and then struck her with killing force. He then fled, attempting concealment. The jury could find all the foregoing; and the fact that the jury convicted Fidler of this offense against Greene, but not against the others, shows an awareness that in the former case there was an escalation of purpose beyond wounding. We think the jury may well have read "murder" and "specific intent," under the instructions, as the equivalent of an intent to kill. However that may be, the evidence negated any substantial risk of a miscarriage of justice in the conviction of Fidler.

---

[5] In other jurisdictions, the use of such a weapon is held to be itself the basis for an inference of intent to kill. See *McArdle* v. *State,* 372 So.2d 897, 901 (Ala. Crim. App. 1979); *Bell* v. *State,* 501 S.W.2d 137, 138 (Tex. Crim. App. 1973); *Martinez* v. *State,* 699 S.W.2d 910, 913 (Tex. Ct. App. 1985).

2. *Lost items.* A tape recording of Greene identifying the picture of Fidler was lost, apparently because of some change of storage arrangements in the district attorney's office. Fidler claimed that the evidence might have had exculpatory value. "When potentially exculpatory evidence is lost or destroyed, the culpability of the government will be weighed along with the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Charles,* 397 Mass. 1, 14 (1986). See *Commonwealth* v. *Walker,* 14 Mass. App. Ct. 544, 547 (1982). Here, whatever may have been the initial fault in losing the tape, judge and defense counsel stated they were satisfied the prosecutor had made diligent efforts to recover it. The tape was material in that it bore on a significant identification. But there was no showing that it would have been exculpatory or that the defense was prejudiced by its loss. The circumstances of Greene's identification of Fidler were exposed and the defense had chances to cross-examine Greene as well as the officers present at the time. The defense went further and introduced the psychiatrist Zigelbaum to impeach Greene's credibility. Any prejudice to the defense appears not substantial enough to justify remand for findings about the possible consequences of the loss of the tape, as the defense has proposed.

There was also a claim of prejudice through the loss of an affidavit supposedly offered by the Commonwealth to support an application for a warrant to arrest Fidler (the arrest itself was not challenged by motion in limine or otherwise). "See affidavit" was typed into the application but no affidavit turned up. The best explanation appears to be that the words did not belong; they reflected the practice in applications for search, not arrest warrants. See *Commonwealth* v. *Grzembski,* 393 Mass. 516, 521 n.7 (1984). If, perchance, an affidavit existed but was lost, the *Charles* standard would apply, with negative result for the defense.

3. *Cross-examination of Hennessy.* The defense complains that the judge barred cross-examining Hennessy to find whether he had smoked marihuana on the night of the assaults. Not so; what the judge forbade (no objection taken) was questioning

Hennessy about a note by a nurse on the medical record at Massachusetts General that "he smokes marihuana." Such inquiry was objectionable because (among other reasons) it was remote; at most it would deal with whether Hennessy was a marihuana user, not with use on the particular night.

4. *Joint trial.* The defense seems to suggest that the judge should have acted to avoid confusion by ordering the alleged crimes against Greene to be tried separately from those against Hennessy and Celata. No such motion was addressed to the judge; the charges were "related" and thus subject to joint trial under Mass.R.Crim.P. 9(a) (1) & (3), 378 Mass. 859 (1979); had a motion been made, decision for dual trials would have been, at most, discretionary, and there is little reason to suppose denial would be thought an abuse of discretion; finally, there is no showing that joint trial was hurtful to the defendant.

*Judgments affirmed.*