COMMONWEALTH *vs.* LEO P. CUNNINGHAM
(and eight companion cases [1]).

Suffolk.  May 1, 1989. — August 23, 1989.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Severance. *Joint Enterprise. Intent. Constitutional Law,* Confrontation of witnesses, Admissions and confessions, Waiver of constitutional rights. *Waiver.*

Criminal convictions were reversed where statements of nontestifying codefendants had been admitted at their joint trial, under the then applicable principles of *Commonwealth* v. *Bianco,* 388 Mass. 358 (1983), and where, with respect to the issue of intent, the statements were not merely cumulative of other evidence and may have affected the jury's decision regarding two of the four defendants on trial. [650-653]

Sufficient evidence was properly introduced at the joint murder trial of four defendants on the issue of one defendant's intent as a joint venturer to support his conviction of manslaughter, and the statements of the non-testifying codefendants, admitted as evidence under the then applicable law, were merely cumulative and could not have affected the jury's decison regarding that one defendant. [653-654]

The judge at a murder trial properly denied three defendants' motions to sever their trials from a fourth defendant's on the ground of mutually antagonistic defenses, where the three defendants' argument that they did not share in the other defendant's intent was not irreconcilable with that defendant's assertion of an insanity defense. [654]

Evidence presented at the hearing on a criminal defendant's motion to suppress statements to police did not support his claim that he was illegally detained at the time he made the statements. [655-656]

There was no error in the conclusions of a judge, ruling on a criminal defendant's motion to suppress evidence at a murder trial, that the defendant had waived his Miranda rights and freely elected to make a statement to police after being charged with murder. [656-657]

The judge at a murder trial correctly concluded that a conversation between two defendants charged with murder, overheard by another prisoner in

---

[1] Three against Louis Riley, three against Michael Riley, and two against Leo Cunningham. The defendants were tried with Ramon Libran. See *Commonwealth* v. *Libran, ante* 634 (1989).

the police lockup shortly after their arrest, was admissible, where there was no assertion that the conversation was coerced and where there was evidence to support his finding that the fellow prisoner was not a police agent. [657]

At a murder trial the judge correctly ruled that a defendant had made a knowing and intelligent waiver of his Miranda rights and that his statement was voluntary; further, the defendant did not receive any improper promise of leniency when interviewed by the police. [657-658]

At a criminal trial in which one defendant was convicted of first degree murder and the three codefendants were convicted of manslaughter on a misdemeanor-manslaughter theory with simple assault and battery as the underlying misdemeanor, the prosecution demonstrated that each defendant shared the mental state required for the crime of which he was convicted, and the evidence was sufficient to warrant a finding beyond a reasonable doubt that the assault and battery the defendants intended was the proximate cause of the victim's death. [658-659]

INDICTMENTS found and returned in the Superior Court Department on February 14, 1985.

The cases were tried before *John T. Ronan*, J., and motions for a new trial were heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Willie J. Davis* for Louis Riley.

*Roger Witkin & Jamie Ann Sabino* for Leo Cunningham.

*John F. Palmer* for Michael Riley.

*Laura Callahan Burnham*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. This appeal by three defendants arises out of the same incidents as those in *Commonwealth* v. *Libran, ante* 634 (1989), decided today. The evidence is set forth there, but we shall summarize the facts briefly here. On December 21, 1984, Ramon Libran (Libran), a codefendant of the three defendants, participated in a fight at an American Legion hall in Chelsea. The next evening, Libran rode around Chelsea in an automobile driven by defendant Leo Cunningham (Cunningham), searching for the people who had fought with him. Also in the vehicle were Leo's girl friend, Margaret McClellan, and the defendants Louis Riley (Louis) and Michael Riley (Michael). A group of witnesses testified that the Cunningham vehicle forced their

automobile to stop, and then Libran came over to determine whether any of the occupants were the people with whom he had fought. When he decided they were not the ones, Libran and the others returned to their vehicle.

Richard Mucci testified that later that evening, the group approached him. Libran and Louis grabbed him and held knives against him. Libran asked Mucci where he could find "Meiggs, Maronski, Borum, and Westmoreland" because, "whoever I find first I am going to kill them."

At approximately midnight, the group was driving along Webster Street in Chelsea when Libran told Cunningham to stop the automobile because he had spotted Meiggs. Meiggs had been walking with his friends, Christopher Borum and Michael Maronski. Meiggs testified that four people got out of the vehicle and that two of them, Libran and Louis, approached him. Borum and Maronski ran in the opposite direction, while Meiggs stood where he was. Libran chased Maronski up the street, away from the automobile, and stabbed Maronski several times. Meanwhile, Louis confronted Meiggs and he admittedly punched Meiggs and cut him with a knife. Maronski died as a result of his injuries inflicted by Libran.

These defendants were each convicted of manslaughter (on an indictment charging murder in the first degree) and two counts of assault and battery by means of a dangerous weapon. Each defendant brought a motion for a new trial. After a hearing, the trial judge denied the motions. The defendants appealed, and we transferred the appeals to this court on our own motion.

Each of the defendants asserts error in the denial of his motion to suppress and the refusal of the judge to sever his trial. Defendants Leo Cunningham (Cunningham) and Michael Riley (Michael) assert error in the denial of their motions for a required finding of not guilty of manslaughter. We conclude that the judge ruled correctly on the motions regarding Louis Riley (Louis) and that his convictions are affirmed. Because we believe that the rights of Leo Cunningham and Michael Riley under the Sixth Amendment to the United States Constitution were violated by the judge's admission of the codefendants'

statements, and that the error affected the verdicts against them, we reverse Leo Cunningham's conviction of manslaughter and Michael Riley's convictions of manslaughter and assault and battery by means of a dangerous weapon. We remand for new trials.

1. *Motion to sever.* Each of the defendants brought a motion to sever his trial on grounds that his rights under the Sixth Amendment to the United States Constitution were violated when the judge admitted the statements that the nontestifying codefendants made to the police. *Bruton* v. *United States*, 391 U.S. 123 (1968). As we explained in *Commonwealth* v. *Libran, supra* at 641-642, the trial judge, in deciding to admit all of the codefendants' statements relied on precedent the reasoning of which the United States Supreme Court has since rejected. The appropriate standard, set out in *Cruz* v. *New York*, 481 U.S. 186 (1987), is that, unless a nontestifying codefendant's statement incriminating the defendant is directly admissible against the defendant, the confrontation clause bars its admission at their joint trial. *Id.* at 193.

The *Cruz* case holds that a violation of the confrontation clause in this manner may, in some instances, be harmless error beyond a reasonable doubt. *Id.* at 194. This court has decided that it will apply a stringent test to determine if a *Bruton* error is harmless beyond a reasonable doubt. *Commonwealth* v. *Dias, ante* 131, 134-138 (1989). *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 (1987). The test is whether the "spillover," which is created by those portions of statements that do not perfectly interlock, was "without effect on the jury and did not contribute to the verdict." *Commonwealth* v. *Sinnott, supra.*

These three defendants were prosecuted on a joint venture theory for most of the indictments. "The test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). These defendants admit that they were present

during the incidents. Thus they were in a position to render aid and assistance, if necessary. The only contested issue is whether each had the requisite intent at the time of the incidents.

In this case we must examine the statements of the codefendants to determine whether the spillover had any effect on the jury's decisions regarding the defendants' intent. We conclude that the statements of the codefendants did not affect the verdicts against Louis Riley, but that the statements of the codefendants may have influenced some of the verdicts against Leo Cunningham and Michael Riley, and thus those verdicts must be set aside.

Cunningham told police that he gave Libran the knife the afternoon before the incident so that Libran could defend himself against the people who had attacked him. Michael Riley stated that Libran grabbed the knife immediately before the attacks on Meiggs and Maronski. Louis Riley said that Cunningham gave Libran the knife just before Libran left the automobile to pursue Meiggs and Maronski. The only person who testified concerning Cunningham's role in arming Libran was Cunningham's girl friend, who testified that Cunningham told her that he had given Libran the knife earlier in the day.

Cunningham contends that the statement of a codefendant that he armed Libran just before the attack, as opposed to giving him the knife hours earlier for self-defense purposes, reinforced a conclusion that he intended that Libran inflict grievous bodily harm on the victim. Cunningham points out that these statements are not cumulative of evidence properly before the jury. One important factor we use to determine if an admission is harmless beyond a reasonable doubt is whether the improperly admitted evidence is cumulative of evidence that is properly before the jury. *Commonwealth* v. *Sinnott*, *supra* at 872 n.8. We agree that these statements, which Cunningham did not have an opportunity to challenge through cross-examination, were not cumulative and may have affected the jury's decision that Cunningham had the intent necessary for manslaughter. Because the contradiction between Cunningham's admissions and the statements of his codefendants relates only to Cunningham's role in arming Libran for the attack

on Maronski, the codefendants' statements could only have affected the verdict against him that resulted from that incident, i.e., the manslaughter conviction. There was other evidence that tended to show that Cunningham had the requisite intent for manslaughter, but it was not overwhelming, at least as that term is defined in *Commonwealth* v. *Marini*, 375 Mass. 510, 521 n.12 (1978) (three full confessions by defendant). Since we cannot know what the jury regarded as critical, we must reverse Cunningham's manslaughter conviction because of the prejudice resulting from the admission of the statements.

Michael Riley's statement when he surrendered to police was exculpatory on the issue of intent. According to Michael's statement, after Libran asked the occupants of Richard Cippolone's automobile if they were the ones who had fought with Libran the previous evening, Michael said to Libran, "[L]ook man this is crazy, I want to go home." In describing the incident in which Libran threatened Richard Mucci with a knife, Michael stated that he grabbed Libran's arm to prevent him from cutting Mucci, and that, when Michael told Mucci to drive away, he used a "mean" voice so that Mucci would listen because Michael did not want any harm to come to Mucci. Michael also claimed, in his statement, that he believed that they were heading home when Libran spotted Maronski and told Cunningham to stop the automobile. Michael stated that he lost sight of Libran when Libran chased Maronski, that he tried to break up the fight between his brother and Meiggs, and that he ran down the street and then back because he got scared and panicked. He stated that he learned that Libran had stabbed someone only when Libran returned to the car and told them.

The statements of Leo Cunningham and Ramon Libran portray Michael as having an intent to assault the people for whom Libran was searching. Libran told police something to the effect, "You better get the other two, I don't want to take this whole rap myself. . . [I]t was Louis' brother, Michael, and the other guy was Leo." In Cunningham's statement, he said, "[A]s far as I was concerned, people were going to get out of my car and have a fist fight with the people that jumped

Ramon." Cunningham indicated that Michael had been with the group since 7 P.M. that night and that they had searched for four hours for those who had "jumped" Libran. Michael, however, stated he did not join the codefendants until about 10:30 or 11 P.M. Cunningham also contradicted Michael's story, that he was running away in a panic during the attacks on Meiggs and Maronski, by stating that Michael was standing behind the automobile.

The Commonwealth argues that there is no true contradiction, and thus no spillover, between Michael Riley's admissions and the statements of the codefendants. Michael admitted that he knew that his brother and Libran had knives, that he heard Libran talking about beating people up, and that, despite this, he never left the group. The Commonwealth points to these admissions as indications that Michael shared an intent to commit assault and battery. These portions of Michael's statement, standing alone, might support the inference that Michael possessed an intent to commit assault and battery. However, such statements cannot support such an inference in light of the other portions of his statement in which he said that he wanted to go home, that he wanted no harm to come to Mucci, that he attempted to break up the fight between his brother and Meiggs and that he was surprised to learn that Libran had stabbed the victim.

One witness, Margaret McClellan, testified that prior to the incidents, all four defendants were talking about the fight the night before and about how they were looking for those who had been involved. McClellan stated that she understood that the four defendants intended to beat up those people if they located them. Another witness, Natalie Bloom, testified that she saw three boys beating on a heavy-set youth (Meiggs) as she drove past the scene. Meiggs himself testified that he was not attacked by Cunningham or Michael, that he saw Libran chase Maronski and that he did not see Michael Riley or Leo Cunningham after they alighted from the vehicle. Christopher Borum also testified that he saw only one person confront Meiggs and that the others stayed by the car. There was also some testimony corroborating Michael's version of events:

Mucci said Michael told him sternly to drive away and Margaret McClellan testified that Michael was surprised when Libran told them he had stabbed someone, and she recalled Michael saying to Libran, "I don't believe you, you shouldn't have stabbed him."

Reviewing this evidence, we note that the statements of Cunningham and Libran that incriminate Michael regarding his intent are cumulative only of Margaret McClellan's testimony as to Michael's state of mind. The testimony regarding Michael's conduct is ambiguous enough that we cannot say that his conduct clearly demonstrated his intent. Compare *Commonwealth* v. *Sinnott, supra* at 873. Given that the evidence concerning his conduct was ambiguous regarding his intent, the jury could have had a reasonable doubt about McClellan's testimony concerning Michael's state of mind without the corroboration provided by Cunningham's and Libran's statements. As we stated in *Commonwealth* v. *Sinnott, supra* at 873, "[i]f the spillover here is corroborative of other evidence which, without such corroboration, permits reasonable doubt concerning a necessary element of proof, such spillover is not merely cumulative because it would necessarily have contributed to the verdict, and reversal would be required." *Id.* As intent was the crucial element of the Commonwealth's case against Michael, we conclude that the statements of the nontestifying codefendants could have affected all three verdicts against him, because the contradiction between Michael's admissions and the statements of his codefendants relate to his intent to participate in any of the incidents. As the other evidence regarding his intent was not overwhelming, his convictions for manslaughter and assault and battery with a dangerous weapon should be reversed.

Louis Riley argues that the verdicts against him were affected by Leo Cunningham's statement that Libran was already armed when Louis joined the group at approximately 7 P.M. Louis contends that this statement permitted the inference that he knew Libran was armed for some time before the stabbing. Louis had told the police that Cunningham gave Libran a knife just before the stabbing. The spillover regarding what time

Louis knew that Libran was armed might be relevant if Louis had been convicted of deliberately premeditated murder, but he was convicted of manslaughter. Louis's own admissions that he emerged from the automobile when Libran spotted the people who he believed had attacked him, and that Louis participated in the assault on Meiggs by punching and stabbing him were sufficient evidence of his intent as a joint venturer to support his manslaughter conviction.

Each defendant also contends that his trial should have been severed because the defenses of the codefendants were antagonistic. Although we have already concluded that severance was required on *Bruton* grounds for two of the defendants, we must determine if severance was necessary for the third defendant, Louis Riley.

Severance is required where the defenses of codefendants are mutually antagonistic and irreconcilable so that "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Commonwealth* v. *Weaver*, 400 Mass. 612, 617 (1987), quoting *Commonwealth* v. *Moran*, 387 Mass. 644, 658 (1982). Severance is not required because the defendants pursued inconsistent trial strategies or asserted antagonistic defenses. *Commonwealth* v. *Moran*, *supra* at 658-659.

We are persuaded that the judge was correct in denying the motion to sever. This was not a case, like *Moran*, in which the "only realistic escape for either defendant was to blame the other." *Id.* at 659. As we discussed in *Commonwealth* v. *Libran*, *supra* at 644, the defenses of Libran and his codefendants were not irreconcilable. Louis Riley's defense was that he was present at the scene, but lacked the necessary intent for a joint venture. Libran's defense was that he was not criminally responsible when he committed the crimes. There was no question who had done the stabbing. Whether the jury found Libran criminally responsible or not, it would not have prejudiced their consideration of Louis's intent.

2. *Motion to suppress*. Each defendant brought a motion to suppress statements made to police, contending that his statement was not voluntarily made. Because these issues would

come up at a new trial, we examine the statements of each defendant. We shall address each defendant's argument in turn, employing the same standard of review: that the judge's subsidiary findings are left undisturbed unless there is clear error, *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982), that the judge's ultimate findings are given substantial deference, *id.* at 145, and that this court makes its own determination whether the judge correctly applied the law to the findings of fact. *Id.*

a. *Leo Cunningham.* Cunningham was arrested in Lynn on December 23, 1984, and taken to the Chelsea police station. Asked by defense counsel if bail was then set by an assistant district attorney, a police detective replied affirmatively. The detective testified that he then read the defendant his Miranda rights and that the defendant replied, "Listen, I didn't kill anyone, I am going to tell you the whole thing." The detective turned on a tape recorder, again read the defendant his rights and interviewed him about the events of the preceding night.

Cunningham argues that his statement to police must be suppressed because it resulted from an illegal detention. He contends his detention was illegal because an assistant district attorney, and not an independent magistrate, set the amount of bail. Defense counsel asserted at the suppression hearing that it is regular practice in Suffolk County for bail commissioners to accept the bail figure "set" by an assistant district attorney without exercising any discretion.

The judge found that Cunningham's decision to give a statement was a "voluntary, individual determination" made without police coercion or deception. He found from listening to the tape recording that Cunningham's voice was clear, and without slurring or delay. He found that Cunningham's responses were appropriate and that his voice displayed no emotion, nervousness, or any lack of control.

The judge ruled that, whether or not Cunningham's detention was illegal had no relevance as to whether or not Cunningham's statements were voluntary. We need not pass on the correctness of that ruling, since we conclude that the evidence does not support Cunningham's claim that he was illegally detained

because his bail was set by an independent magistrate who failed to exercise discretion.[2] A detective testified, in response to a leading question, that an assistant district attorney set the bail. Defense counsel himself, however, conceded that an independent magistrate set the bail, but asserted he did so without exercising discretion, as required by G. L. c. 276, § 57 (1986 ed.). Cunningham offered no evidence to support the assertion that the magistrate acted without exercising discretion. Simply because in one instance an assistant district attorney suggested a bail figure and the magistrate set bail at that amount is not proof that the magistrate exercised no discretion. We conclude that the judge correctly found that Cunningham's confession was voluntary beyond a reasonable doubt.

b. *Louis Riley.* Louis Riley was arrested at Massachusetts General Hospital after Stephen Meiggs identified him as his assailant. A Chelsea police detective read Louis his rights and asked if he understood them. Louis said that he did and told police that he and Libran were jumped while walking on Cherry Street and that one of the people who attacked them had stabbed Ramon Libran.

Michael Maronski, the stabbing victim, died after Louis made this statement. At 4 or 5 A.M., the detective again interviewed him. The detective repeated the Miranda warnings, told Louis that Maronski was dead, and that Louis now was charged with his murder. Louis then told the detective about the fight the night before and that they had gone looking for the people involved. He stated that they were driving when Libran yelled to stop because he believed he had spotted the group. Louis said that he got out, punched and stabbed Meiggs and then got back into the automobile. He stated that Libran then returned from the opposite direction and said he had stabbed someone "two or three times."

Louis asserts that his waiver of his Miranda rights was not intelligent, because he did not understand the "arcane legal

---

[2] Accordingly, we need not address Cunningham's argument that an illegal detention due to improper bail procedure is analogous to an illegal arrest due to lack of probable cause. See *Taylor* v. *Alabama*, 457 U.S. 687, 689-690 (1982).

theory" of joint venture. Louis argues that he did not understand the consequences of his statement, because he believed he was making an exculpatory statement in identifying Libran as the killer. The judge ruled that the police do not have any duty to give legal advice to suspects. He found that Louis made an unfettered decision to cooperate with police.

This court has already ruled that the police are not required "to inform a suspect of the nature of the crime about which he is to be interrogated." *Commonwealth* v. *Medeiros,* 395 Mass. 336, 345 (1985). Here, the defendant had more information than is required because he knew that he faced a murder charge when he made the decision to speak to police without consulting a lawyer. We decline to impose a requirement that the police must explain all possible legal ramifications before a statement can be considered voluntary. See *Commonwealth* v. *Wills,* 398 Mass. 768, 777 (1986). We find no error in the judge's conclusion that, beyond a reasonable doubt, Louis effectively waived his Miranda rights and freely elected to make the statement he did.

As we explained in *Commonwealth* v. *Libran, supra* at 639-640, the conversation between Louis Riley and Ramon Libran that was overheard by another prisoner was admissible against each as a voluntary statement, because there was evidence supporting the judge's finding that the fellow prisoner was not a police agent and there was no assertion that their statements were coerced.

c. *Michael Riley.* Michael Riley surrendered himself to police about two weeks after the incident. When he first arrived at the Chelsea police station, he appeared "visibly shaken" and "disheveled," according to a police detective. He was accompanied by a priest.

The defendant was advised of his Miranda rights, but was too upset to speak. The detective waited about one hour for Michael to calm down before recording his statement. At the beginning of the recorded interrogation, the detective again gave Michael his Miranda rights. The priest told Michael to tell the truth, saying that it would be best to tell the truth. The detective also said that, "if you tell the truth and what you are

saying is true — that you had nothing to do with it, then you don't have anything to worry about if you tell the truth." Michael kept turning to the priest for reassurance during the interview and held a Bible throughout the session.

Michael argues that his low education level and his volatile emotional state combined with subtle psychological coercion to cause him to waive his Miranda rights and to make his statement to police. The judge found that Michael's motivation, at least in part, "was to unburden a troubled conscience." He found that the defendant understood his rights and made a voluntary statement after twice hearing the Miranda warnings. The judge found that Michael's answers were responsive to the questions.

Looking at the totality of the circumstances, we conclude that the judge correctly ruled that Michael made a knowing and intelligent waiver and that his statement was voluntary beyond a reasonable doubt. The detective's advice, along with that of the priest, that it would be better if Michael told the truth, did not render the statement involuntary. See *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980). The detective's comment that the defendant had nothing to worry about if he told the truth was not an improper promise of leniency because it was conditioned on the truthfulness of Michael's claim that he had nothing to do with the crimes. *Commonwealth* v. *Hudson*, 185 Mass. 402, 405-406 (1904).

3. *Required findings of not guilty.* Defendants Leo Cunningham and Michael Riley argue that the judge should have allowed their motions for required findings of not guilty of manslaughter because there was no evidence to support a conviction predicated on the theory of manslaughter advanced to the jury. The judge instructed the jury only on the misdemeanor-manslaughter theory of involuntary manslaughter. He told them that, if they found that these defendants believed that Libran's intent was only "to 'sock' somebody," that is, commit a simple assault and battery, and the others were willing and able to help him, then the defendants are guilty of manslaughter. The jury convicted Libran of premeditated murder and found the

other three defendants guilty of manslaughter. The defendants contend that, since the jury found Libran deliberately premeditated the killing, while finding that they intended only that the assault and battery occur, the verdicts show that they did not share Libran's intent. The defendants also argue that the assault and battery they intended was not the proximate cause of the victim's death, and thus their convictions should be reversed.

It is true that, in order for a joint venturer to be found guilty of the same crime as the principal actor, he must share that person's intent, *Commonwealth* v. *Millyan*, 399 Mass. 171, 185-186 (1987), and these defendants were not found guilty of the same crime as the principal actor. However, it is clear from the language of the test for joint venture that joint venturers need not all share the same intent to be convicted for their participation. The intent requirement is whether each defendant was present at the scene of the crime and was acting "with knowledge that another intends to commit the crime or with intent to commit a crime." *Commonwealth* v. *Bianco, supra* at 366. To sustain a conviction based on a joint venture, the Commonwealth need only show that each defendant shared the mental state required for the crime of which he was convicted, and that he satisfied the other elements of the test for joint venture. *Commonwealth* v. *Longo*, 402 Mass. 482, 486-487 (1988).

The argument that the assault and battery that the jury found was intended was not the proximate cause of the victim's death is not persuasive. This case is distinguishable from *Commonwealth* v. *Bianco, supra*, in which this court ruled that the evidence was insufficient to warrant a finding beyond a reasonable doubt that it was the assault and battery on a victim that led him to attempt an escape by jumping into his vehicle, which then plunged into a lake, rather than merely a desire to protect his property that prompted him to act. *Id.* at 363. Here, there was no possibility that conduct by the victim was an intervening cause in his death.

4. *Conclusion.* For the reasons we have set out, we order the following dispositions:

a. *Leo Cunningham.* Because we conclude that the *Bruton* error may have affected the jury's verdict of manslaughter

against him, that judgment is reversed, the verdict set aside, and the case remanded for a new trial. His convictions of assault and battery by means of a dangerous weapon are affirmed.

b. *Louis Riley.* As we found no prejudicial error in his trial, we affirm his convictions of manslaughter and assault and battery by means of a dangerous weapon.

c. *Michael Riley.* Since we conclude that the *Bruton* error may have affected the verdicts, the judgments of manslaughter against him and of assault and battery by means of a dangerous weapon are reversed, the verdicts set aside, and the cases remanded for a new trial.

*So ordered.*