COMMONWEALTH vs. DION YOUNG
(and three companion cases[1]).

No. 92-P-1332.

Barnstable. June 8, 1993. - October 27, 1993.

Present: PERRETTA, KAPLAN, & GILLERMAN, JJ.

*Homicide. Malice. Joint Enterprise. Evidence,* Joint enterprise, Admitted
without objection, State of mind. *Practice, Criminal,* Instructions to
jury, Question by jury.

At a murder trial, the evidence of provocation, although presenting a fac-
tual issue for the jury, did not, as matter of law, preclude them from
inferring malice from the intentional use of a deadly weapon. [433-434]
At the joint murder trial of two brothers charged in a fatal shooting, the
evidence was sufficient to establish that the brother who did not fire the
murder weapon knowingly participated in a joint criminal venture with
the other, where the jury could properly find that he acted consciously
with the other in the intentional use of a deadly weapon against the
victim. [434-437]
At the trial of two defendants charged with murder, no substantial risk of
a miscarriage of justice was occasioned by the admission of one defend-
ant's statements, without a jury instruction limiting such evidence to
the case against that defendant, where any prejudice to the codefendant
would have required a strained interpretation of the statements. [437-
438]
At a murder trial, the judge's instruction to the jury on the issue of provo-
cation, viewed in the context of the charge, fully and accurately ex-
plained the law. [438-440]
In supplemental instructions given in response to a question from the jury
during their deliberations at a criminal trial, the judge was not required
to reinstruct them on matters not directly responsive to their inquiry.
[440-441]
In the circumstances of a joint murder trial, the unobjected-to admission
of one defendant's statement, without an instruction limiting the jury's
use of the statement to the case against that defendant, did not subject
his codefendant to a substantial risk of a miscarriage of justice. [441-
442]
At a murder trial the judge did not err in excluding proffered evidence,
which was no more than cumulative, tending to show knowledge of one

---

[1]One of the companion cases is against Dion Young; the remaining two
are against Frank C. Young, Jr.

of the defendants that the victim had made threats of violence against him. [442-443]


INDICTMENTS found and returned in the Superior Court Department on August 20, 1990.

The cases were tried before *James J. Nixon*, J.

*Dana A. Curhan* for Frank C. Young, Jr.

*Jeremy M. Carter* for Dion Young.

*Julia K. Vermynck*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. The conviction of each of the brothers Young, Dion and Frank, on the charge of murder in the second degree[2] was the outcome of a series of events that began with a brawl near a 7-Eleven convenience store in Hyannis on June 26, 1990, and ended three weeks later at a birthday party in Barnstable where Anthony Edwards (Tony) was shot dead.

Each brother claims that his motion for a required finding of not guilty should have been allowed and that prejudicial errors were committed in certain other respects. We shall discuss the motions first, summing up the evidence most favorable to the Commonwealth (culled from the testimony of twenty-nine witnesses), see *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), but including only the evidence admitted up to the time the Commonwealth rested and when the motions were filed.[3] If the evidence, together with inferences therefrom which are not too remote, is sufficient to permit a rational juror to find the essential elements of the

---

[2]Both defendants were also charged with and convicted of illegal possession of a handgun. In his brief Frank specifically indicates that he is not appealing from the weapons charge; Dion also makes no argument directed toward the weapons charge.

[3]The motions were not renewed at the close of all the evidence. The defendants did move to set aside the verdict of guilty of second degree murder, on the ground of insufficiency of the evidence to warrant that verdict. We need not discuss these motions separately, for the Commonwealth's case did not deteriorate during the presentation of the defendants' evidence. Compare *Commonwealth* v. *Griffin*, 19 Mass. App. Ct. 174, 178 n.2 (1985).

crime beyond a reasonable doubt, the judge was correct in denying the motions. *Ibid.*

1. *The events of June 26.* According to one witness, a regular Barnstable crowd, along with other young men from Harwich and Mashpee, hung out at the North Street 7-Eleven in Barnstable during the summer of 1990. For a reason no one clearly remembered, perhaps too trifling to recall, a fist fight broke out which eventually engaged Dion, Frank, and their friends on one side, and Tony and his friends on the other side. The State police arrived. Tony started to leave the area when Frank, coming up on Tony from behind, struck him on the head with a plank of wood, bringing him to the ground. Frank and Dion then ran off together, with Dion threatening, "Next time it's going to be bullets. Next time it's going to be bullets."

2. *The shooting episode.* The testimony on the events surrounding the shooting was terse and to the point. About one week after the brawl and approximately two weeks before the party, which began in the early morning hours of July 15, 1990, Luther Culberson, a friend of Frank, test-fired a .25 caliber handgun into the air. Sparks emerged from the weapon, and Culberson gave the gun to Frank to be cleaned. Frank did not return the gun.

About one week before the party, Dion arranged for Tanya Bass, the mother of his child who was then living in Mississippi and about to come to Massachusetts, to bring a handgun that Dion had previously left with her. When Bass arrived in Massachusetts, Dion took the gun from her and did not return it. Bass identified the weapon she brought to Dion. It was a .22 caliber handgun. A ballistics expert later testified this handgun was consistent with the weapon that fired the projectile recovered from Tony's body.

On the day of the party a friend of Dion who had a firearms identification card, at Dion's request, purchased a box of ammunition and gave it to Dion. That afternoon Dion was seen cleaning a handgun. That evening, before the party, the friend visited with Dion. While he was there, Dion fired the weapon into the air.

On the afternoon of the party, Culberson and Frank were at a barbecue together. Culberson told Frank not to bring the .25 caliber handgun to the party that night. Frank said, "cool." Further on in the conversation with Culberson, Frank said he was wondering if Tony was going to be at the party. Later that night, at the party, Culberson saw the imprint of the gun in Frank's back pocket.

Dion and Frank did not arrive at the birthday party together. Culberson and Frank arrived around 12:15 A.M., left within a short time, and returned around 1:15 A.M. Dion was there, along with some of the friends of the brothers. Tony arrived after Dion but before Frank.

There were signs of trouble before Frank returned to the party. In the basement of the house where the partygoers had gathered, a friend of Tony put his arm around Dion and told him that Frank had a problem because he hit Tony in the head with a stick. The friend urged Dion and others to stay out of it so that Frank and Tony could settle the dispute. Tony, who heard the conversation, was "wild" and "out of control." (The autopsy showed he had a blood alcohol level of .13 and fifty micrograms of cocaine in his bloodstream at the time of death.) Jumping up and down, Tony said, "Tell them, Muskie [Tony's friend]. Tell them, Muskie, or I will." About this time, Frank arrived, and Dion went over to his brother and talked with him. He said to Frank, "Come on, man. Let's do this." Frank put his hand up underneath his shirt and said to Culberson, "Come on, Tip [Culberson's nickname]." Culberson said, "No, man, he's [i.e., Tony] my cousin. I'm not going."

At this point Tony walked up to Dion and Frank, and said to Frank, "What's up Nitty [Frank's nickname]? You got a piece? You got a piece? You got a knife? You're going to need it. You're going to need it." Frank stood his ground, and Tony went on: "I'm ready. Come on. I'm ready. Let's go." Frank said, "No, I don't want to fight with you, Tony. Just leave me alone." Tony pressed on: "Come on, Frank. Let's go outside, just me and you. I'm ready. Let's go outside right now." While Tony was thus challenging Frank, Dion

had a handgun in his right hand by his side. Someone then stepped into the middle of this confrontation and told the group to take the fight outside. Frank and Dion proceeded upstairs, surrounded by their friends, and thence out of the house to a driveway and a yard. Tony left the basement through the bulkhead door.

Once outside the house, Frank and Dion stood beside each other at the street end of the driveway near the steps of the house, making no effort to leave. Tony came out from behind the house with a stick in his hand, possibly a mop handle. Tony resumed his taunting of Frank: "Frank, you want to hit people with sticks? I'm going to hit you with a stick now." Frank said, "Tony, I'm telling you to stay away from me, man. Don't come near me. Just leave me alone." Tony then swung the stick at Frank, missed him, hitting a tree behind Frank. Frank and Dion jumped back. Dion then stepped in front of his brother, a gunshot was heard, and sparks were seen. Dion had a "black tube" in his hand. The brothers immediately ran from the scene together.

Tony was shot but seemed not to know it. He was asked if he was hit. Tony said, "I don't know. Let me go check." He returned to the house where people told him he was shot. An ambulance was called; Tony was helped to go back outside the house where he said he was fainting. Then he collapsed and died. The .22 caliber bullet had perforated the right side of his heart, and perforated or injured his stomach, spleen, liver, left kidney and diaphragm. The wound was of the type that kills in seconds or minutes.

Two witnesses saw Dion, Frank and others running from the party down the road. One witness, parked around the corner, recognized Dion and heard him say, "I got that motherfucker." Another witness, a relative of Tony, ran after the brothers at a distance of about thirty feet. Frank turned around, pointed his .25 caliber handgun at the witness, and asked, "Who is that?" The witness replied, "It's Robert, man. You shot my cousin." Frank said, "No I didn't. I missed him."

The group reached a friend's house nearby where they sat without talking. A cab was called. Frank went outside, saying he needed a breath of fresh air. The others followed outside, and waited for the cab. Dion and Frank talked briefly, Dion gave something to Frank, and Frank ran to the rear of the house where a red truck was parked, and returned as the cab arrived. Later a .22 caliber handgun and a .25 caliber handgun were found in the wheel well of the frame of the red truck. The .22 caliber weapon found in the red truck was the same weapon identified by Bass and, as we have said, was consistent with the weapon that fired the projectile recovered from Tony's body.

Frank and Dion returned to their apartment and later went to a friend's house in Hyannis. They appeared scared and tense. Dion said that "they did something and they was hiding." They ran to the back bedroom and stayed there until the police arrived to arrest them.

The brothers were brought to the Barnstable house of correction. Both Dion and Frank gave statements to the police. Dion denied that he or Frank shot Tony. Frank admitted that after Tony tried to hit him with the stick he reached into his back pocket, took the safety off the weapon, drew the gun up to waist level, and "offed the trigger" one time.[4]

Later, still at the house of correction, a correctional officer, Rodney Lynch, overheard a conversation among the brothers, who were being held in adjacent cells, and Gary Little, who occupied the third of three cells in the cell block. In response to Little's description of his stabbing a person, Frank said, "Shooting someone is different than stabbing someone." The conversation turned to the birthday party.

---

[4]Further on in his statement Frank added that the weapon he used was a .22 caliber handgun, the same weapon that Bass brought to Massachusetts for Dion. Frank also indicated that during the confrontation he had released the safety on the gun, but the officer who received the statement testified that only the .25 caliber handgun had a safety. Thus there is some reason to believe that Frank was trying to protect his brother. Nevertheless, given the testimony that Frank said to the person who followed him immediately after the shooting that he "missed" shooting Tony, the jury was entitled to find that Frank did fire his weapon at Tony, or that he attempted to fire his weapon at Tony.

Frank and Dion talked about going to the party, and Frank said that they had gone there "with a mission." Shortly after that statement, Lynch heard Dion say, "Frank's gun did not go off."

3. *Discussion.* In support of his motion, Dion argues that the verdict of guilty of murder in the second degree was precluded because the evidence of provocation was sufficient to negate the element of malice.

We start with the recitation of established fundamentals. Malice is an essential element of the crime of murder. *Commonwealth* v. *Colantonio*, 31 Mass. App. Ct. 299, 311 (1991). "Malice aforethought does not necessarily require a showing of ill will toward the victim. Rather it comprehends any intent to inflict injury without legal justification or palliation." *Commonwealth* v. *McInerney*, 373 Mass. 136, 140 (1977), quoting from *Commonwealth* v. *Festa*, 369 Mass. 419, 424 (1976). It can be established by (i) proof of an actual intent to kill the victim, (ii) proof of an actual intent to do the victim grievous bodily harm, or (iii) proof of an act which a reasonably prudent person would know is likely to result in the death of another. *Commonwealth* v. *Moore*, 408 Mass. 117, 134 n.9 (1990). The third prong of malice does not require "any foresight by the defendant" of the likely consequences of his or her act, if, objectively, "a reasonably prudent person would have known of the plain and strong likelihood that death would follow a contemplated act." *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1, 472 n.4 (1987). Thus, malice may be inferred from the intentional use of a deadly weapon. *Commonwealth* v. *Campbell*, 375 Mass. 308, 312 (1978). *Commonwealth* v. *Lowe*, 391 Mass. 97, 107-108, cert. denied, 469 U.S. 840 (1984). *Commonwealth* v. *Colantonio*, 31 Mass. App. Ct. at 311.

There was sufficient evidence for the jury to find beyond a reasonable doubt that Dion intentionally used a deadly weapon and that he shot Tony without legal justification or palliation.[5] He threatened the use of a deadly weapon as he

---

[5]There was no direct evidence that Dion shot Tony. One witness testified, as noted in the text, that Dion jumped in front of Frank and was seen

left the brawl on June 26 ("Next time it's going to be bullets"). Before the July 15 party he arranged for Bass to bring his handgun to him from Mississippi, and he arranged for a friend to buy a box of ammunition. He cleaned his gun the afternoon before the party. During the confrontation with Tony in the basement, while he was in possession of the same weapon, he said to Frank, "Come on, man. Let's do this." Immediately thereafter, he was seen holding the same handgun in his right hand by his side. Outside the house, he jumped between Frank and Tony, drew his weapon and fired, presumably at Tony. See note 5, *supra.* Tony died almost immediately. The .22 bullet found in Tony's body came from Dion's weapon. Finally, he fled from the scene saying, "I got that motherfucker." These events amply supported the jury's finding of malice.

There was evidence which, if believed, would have permitted a finding either in justification or mitigation of the crime. But the mere introduction of such evidence does not require the conclusion that the inference of malice from the intentional use of a deadly weapon is rebutted as matter of law. *Commonwealth* v. *McInerney,* 373 Mass. at 147-148. The evidence of provocation merely presented a factual issue for resolution by the jury — whether the Commonwealth proved the absence of provocation beyond a reasonable doubt. *Commonwealth* v. *Gagne,* 367 Mass. 519, 523 (1975). There was no error in the denial of Dion's motion.

The denial of Frank's motion turns on the law of joint venture. As to that, Frank argues that he committed no overt acts in furtherance of Dion's alleged crime, and there was not sufficient evidence to establish his knowing participation in a criminal joint venture with Dion. In short, Frank argues that he was a mere bystander.[6]

---

holding a "black tube." A number of witnesses who were present at or near the shooting testified to hearing a ".pop."

[6]Frank also argues that the evidence was not sufficient to warrant Frank's conviction on a felony-murder theory. We need not consider that argument because the verdict slip gave the jury the option — in the event of a guilty finding of murder in the second degree — of choosing either

Joint venture may be found where the defendant (i) was present at the scene of the crime, (ii) with knowledge that another intends to commit the crime, or with intent to commit the crime, and (iii) by agreement is willing and available to help the other if necessary. *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). There is no need to have an "anticipatory compact." *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. 506, 513 (1987). It is enough that "at the climactic moments the parties consciously acted together in carrying out the criminal endeavor . . . ." *Ibid.* While the prosecution must show that the defendant shared the mental state required for the crime charged, *Commonwealth* v. *Funches*, 379 Mass. 283, 295 (1979), the defendant's knowledge or intent is a matter of fact which may be inferred by the jury from the evidence developed at the trial. *Commonwealth* v. *Longo*, *supra* at 487. "To be convicted of murder on a joint venture theory '[a] joint venturer need only intend that the victim be killed or know that there is a substantial likelihood of the victim's being killed.'" *Commonwealth* v. *Stewart*, 411 Mass. 345, 350 (1991), quoting from *Commonwealth* v. *Podlaski*, 377 Mass. 339, 347 (1979). Mere knowledge of planned criminal conduct, or failing to take affirmative steps to prevent it, is not enough to be found guilty as a joint venturer. *Commonwealth* v. *Longo*, *supra* at 486-487 n.5.

The evidence permitted the jury to find that Frank was much more than a bystander — that in fact he acted consciously together with Dion in the intentional use of a deadly weapon against Tony, satisfying the requirements of knowledge and intent.

The jury could have found from the evidence that throughout all the relevant events — from the brawl on June 26 to the arrest of the brothers on July 15 — Dion and Frank acted in unison when they were together and in a precisely parallel fashion when they were separated. They fought together at the brawl on June 26; after Frank hit Tony from behind, Dion supported what Frank did by threatening bullets the

"killing with malice aforethought" or "felony murder." The jury chose "killing with malice aforethought."

next time. They each came into possession of guns before the party; each one brought his gun to the party. The imprint of Frank's gun in his pocket was visible, and Dion openly displayed his weapon in the basement of the party house when confronted by Tony. Dion, at the end of a conversation with Frank, said, "Let's do this," and, when the group was told to leave the house, Dion and Frank walked up the basement stairs together, and together they left the house. They chose not to leave the area but instead stood together in the driveway outside the house waiting to confront Tony. The jury could have found that, when Tony swung his stick and missed Frank, Dion stepped forward and shot Tony. Frank, running from the scene with Dion, told a pursuer that he "missed" shooting Tony, and he told the police that he "offed the trigger" once. On that evidence the jury could have found that Frank shot and missed Tony at the same time that Dion shot and hit Tony. See *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. 391, 398 (1987) ("evidence may be sufficient as against a motion for a required finding although there are elements in it that are inconsistent or contradictory"). Frank, while incarcerated in Barnstable, admitted that he and his brother went to the party on a "mission," and the jury could have found that the mission was to shoot Tony.

After the shooting, Frank and Dion fled the scene together. Frank, with Dion's cooperation, hid their weapons in a red truck, and together they hid from the police until they were arrested. The jury could have found from the evidence that at the climactic moments, as we said in *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. at 513, Frank and Dion consciously acted together in carrying out the criminal endeavor of intentionally using a deadly weapon. The jury were entitled to infer that Frank and Dion each knew that the other was carrying a weapon at the party. As it happened, Dion's weapon was the instrument of the murder, but it was equally likely that Frank's gun was to be the murder weapon. Frank's motion was correctly denied; in the circumstances

presented, the jury could determine that Frank and Dion were each responsible for the acts of the other.[7]

4. *Frank's further claim of error.* Frank claims that the judge committed reversible error when statements made by Dion, while incarcerated, to Officer Worthington were admitted in evidence without limiting such evidence to the case against Dion. Dion had made two previous postarrest statements to the police; in brief, he denied that he or Frank had a gun or shot Tony. During his second statement to the police, the trooper told Dion that they knew that a .22 caliber gun had been used to kill Tony.

Frank argues that statements of Dion made after his arrest and after the termination of the alleged joint venture were not admissible as against Frank, and he identifies one of Dion's remarks in his third statement as particularly damaging to Frank's defense. Following his first two statements to the police, Dion struck up a conversation with Officer Worthington in the cell block. When asked by the officer whether he had shot Tony, Dion replied, "I didn't shoot anyone." When asked if Frank had shot Tony, Dion replied, "I didn't shoot him." Following that exchange, Dion gave his version of events, mainly to the point that after he cleaned his gun it disappeared, and again he said, "I didn't shoot anyone." Frank's argument now is that the jury would likely interpret Dion's response to the question whether Frank shot Tony (denying that he, Dion, shot Tony) as a statement that Frank had shot Tony.

If we assume (as appears to be the case) that Frank would have been entitled to a limiting instruction with regard to Dion's postarrest statements, see *Commonwealth* v. *Drew*, 397 Mass. 65, 71 (1986); *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993), the issue now raised appears to be an afterthought. The defendants' pretrial motion to suppress certain postarrest statements made to the police did not include the statement of Dion now challenged. There was no

---

[7]Frank also argues that he withdrew from the joint venture before the shooting, but the evidence did not require the jury to draw such a conclusion.

objection at the trial to the admission of the statement as against Frank, and there was no request for a limiting instruction.

The interpretation now given to Dion's remark must have seemed farfetched to trial counsel. Given the fact that Dion had by then been told that it was a .22 caliber bullet that killed Tony, and that Dion was carrying a .22 caliber weapon, Dion had every reason to insist on denying that he shot Tony. The balance of Dion's statement to Worthington bears that out. In any event, the test is whether there was a substantial risk of a miscarriage of justice, and we conclude that there was no such risk. The interpretation urged upon us is too strained to have been damaging to Frank. Dion had already asserted in his two previous statements that neither he nor Frank was implicated in the shooting. Further, there was an abundance of evidence that Frank and Dion acted together to protect each other throughout the episodes we have recounted; indeed, Dion interrupted his conversation with Worthington to ask to speak to his brother. The request was granted, and the two brothers talked. The likelihood that the jury would, in these circumstances, construe Dion's remark — natural enough in the context — as pointing the finger at his brother, is too remote to constitute a substantial risk of miscarriage of justice.[8]

5. *Dion's further claims of error.* Dion argues that the judge's main charge covering second degree murder did not discuss provocation (by Tony) offsetting malice, and that the judge's subsequent discussion of this matter in the course of describing voluntary manslaughter was too late because the jury would infer that the mitigating circumstances did not apply to deliberations of first and second degree murder. There was no error.

After instructing on various preliminary matters appropriate to criminal proceedings, and after his discussion of murder in the first degree and in the second degree, the judge

---

[8]There was no "Bruton problem." *Bruton* v. *United States*, 391 U.S. 123 (1968). Both defendants took the stand. See *Commonwealth* v. *Cunningham*, 405 Mass. 646, 649 (1989).

introduced the subject of manslaughter precisely as requested in writing by Dion. Voluntary manslaughter, he instructed, is:

> "intentional killing resulting from a sudden transport of the passions of fear, anger, fright, nervous excitement, or heat of blood, when there is no time to deliberate, and when such passion or heat of blood is produced by adequate and reasonable provocation and without malice, or upon sudden combat that would have been likely to produce in an ordinary person an abnormal state of mind and actually did produce such state of mind in either or both of the defendants. The law provides for the crime of manslaughter in recognition of the frailty . of human nature. If a person kills another in the heat of passion which is occasioned by adequate and reasonable provocation or in sudden combat, then, even though a person has an intent to kill, the killing is designated manslaughter, not murder, because of the mitigating circumstances. The factor that distinguishes voluntary manslaughter from murder is not an absence of intent, but rather the absence of malice aforethought."

The judge continued his charge by including a thorough and detailed discussion of self-defense and defense of another, pointing out the distinction between justification and mitigation (but without resorting excessively to that terminology), as well as the Commonwealth's burden to prove beyond a reasonable doubt that Dion did not act in self-defense or in defense of his brother, or, alternatively, that Dion used excessive force in response to the provocation which, if proven by the Commonwealth, would constitute manslaughter.

In *Commonwealth* v. *Albert*, 391 Mass. 853, 858-859 (1984), the defendant argued that the judge's instruction on self-defense came after he had discussed the definitions and degrees of murder and manslaughter, and thus the instruction on self-defense came "too late." The argument was rejected. "There is no reason to believe that a juror would be

misled by inclusion of the self-defense charge toward the end
rather than the beginning of the judge's instructions, as long
as the charge is accorded appropriate emphasis when it is
given." *Ibid.* "[T]he law does not require repetition of the
same thought at each turn." *Commonwealth* v. *McLeod*, 394
Mass. 727, 739, cert. denied sub nom. *Aiello* v. *Massachu-
setts*, 474 U.S. 919 (1985). Viewed as a whole, the instruc-
tion on provocation fully and accurately explained the law.
See *Commonwealth* v. *Carrion*, 407 Mass. 263, 270 (1990).

*Commonwealth* v. *Boucher*, 403 Mass. 659 (1989), upon
which Dion relies, provides no help. There, unlike the charge
in this case, the judge failed entirely to instruct the jury that
if the Commonwealth proved that the defendant, while privi-
leged to use force, used excessive force, the defendant would
be guilty of manslaughter, not murder.

Dion also argues that the judge's supplementary instruc-
tions in response to questions from the jury were defective.
After a three-day weekend, the jury asked for clarification of
the difference between first degree murder and murder in the
second degree. They also sought clarification of the differ-
ence between deliberate premeditation and malice afore-
thought. After discussing deliberate premeditation, the judge
discussed malice. He said that malice is "[a]n intentional
killing of a human being without legal justification or excuse
with no extenuating circumstances sufficient in the law to re-
duce the crime to manslaughter . . . ." He added that mal-
ice flows from a wrongful motive, "as distinguished from the
frailty of human nature," and that malice includes any "un-
excused" specific intent to kill, or the "unexcused" specific
intent to do grievous bodily harm, or the "unexcused" intent
to do an act creating a strong likelihood that grievous bodily
harm will follow. This was the same language that the judge
used in a portion of his original charge.

Counsel objected, citing the judge's failure, in his discus-
sion of malice, to reinstruct the jury on the law of man-
slaughter, including specifically the subjects of provocation,
sudden passion, self-defense or defense of another, and acci-

dent. (In his main charge, the judge told the jury that there was evidence of self-defense and defense of another.)

There is no merit to this argument. The questions from the jury, as the judge said in open court, revealed a concern with the distinction between first degree murder and second degree murder, suggesting that the jury had rejected self-defense and defense of another. See *Commonwealth* v. *Colantonio*, 31 Mass. App. Ct. at 310. The elements of that distinction were discussed, and the judge appropriately included a reference to manslaughter, where mitigating circumstances are sufficient to negate murder. Given the thrust of the jury's questions, there was no need to say more. "The judge was not required to repeat his thorough instructions on self-defense, particularly here, where such repetition would not have been directly responsive to the jury's inquiry." *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 611 (1987).[9]

Dion next claims that a portion of the overheard conversation while Dion and Frank were being held in Barnstable, Frank's statement that he and Dion went to the party on a "mission," should have been limited to the case against Frank. There was no objection to the testimony and no limiting instruction requested. If we assume, as we did earlier in connection with a similar argument by Frank, that the judge would have granted a limiting instruction if so requested, the test is whether the evidence erroneously admitted against

---

[9]We have reviewed the remaining claims with regard to the judge's instruction. As to the charge on felony-murder, see note 6, *supra*. As to the judge's mistake (saying, in the circumstances described, that the verdict must be "guilty" when he plainly meant that the verdict, in those circumstances, must be "not guilty"), the error, taken in the context of the judge's careful and accurate instructions as a whole, was so obvious as to be harmless. In that respect we note that Dion's counsel did not object to the judge's evident mistake.

There is also no merit to Dion's claim that the discharge of a juror at the conclusion of the trial, before deliberations began, jeopardized his right to a fair trial. The judge properly exercised the discretion authorized by G. L. c. 234A, § 39, and neither defense counsel objected to the juror's removal. There was no prejudice to Dion, much less a substantial risk of a miscarriage of justice.

Dion created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). Reversal on *Freeman* grounds is unusual. It is a "rarely used power," *Freeman, supra* at 564, exercised only when a "decisive matter has not been raised at trial." *Commonwealth* v. *Conroy*, 333 Mass. 751, 757 (1956).[10] The evidence in this case does not call for the exercise of this unusual power. Earlier in this opinion, we reviewed the Commonwealth's evidence against Dion; the case against him was strong. The jury could have found that he came to the birthday party with his gun and shot Tony dead immediately after Tony swung and missed Frank. There was ample opportunity to avoid combat, but it was rejected. There was neither mistake nor remorse; "I got the motherfucker," he said. The limitation of Frank's statement to the case against Frank would not likely have changed the verdict.

Dion argues, too, that the judge erroneously excluded evidence of Dion's own knowledge of Tony's propensity for violence. The argument mischaracterizes the evidence, which was as follows. Dion testified that following the brawl and before the party he received two threatening telephone calls from Tony. In the first call, Tony told Dion that "he was going to get us." In the second telephone call Tony said, "The next time you see us, you better be packing," meaning, "You better have a gun." Further on during this direct examination, Dion was asked whether he had had conversations with other people concerning Tony "coming to get you." Dion replied that he did and that the person was one Darrel Burgo. Counsel asked for the conversation; upon objection by the prosecutor, and following a lengthy sidebar conference, the question was excluded.

*Commonwealth* v. *Fontes*, 396 Mass. 733 (1986), holds that a defendant asserting self-defense in a homicide case may prove that he knew of specific acts of violence recently committed by the victim. *Id.* at 735-736. The defendant may also present evidence of the victim's threats of violence

---

[10]*Conroy* is the opinion Justice Cutter cited for the test announced in *Freeman.*

against the defendant and known to the defendant. *Commonwealth* v. *Rubin*, 318 Mass. 587, 588 (1945). A defendant may also present evidence of the victim's reputation as a violent person and of the defendant's knowledge of that reputation. *Commonwealth* v. *Edmonds*, 365 Mass. 496, 502 (1974). All such evidence bears on the defendant's reasonable concern for his safety — his state of mind.[11]

Nevertheless, the exclusion of the evidence worked no prejudice to Dion. As noted above, Dion had already testified to two threatening telephone calls from Tony, and a third threat, this one merely hearsay, was no more than cumulative. See *Commonwealth* v. *Cunningham*, 405 Mass. 646, 650 (1989).

*Judgments affirmed.*

---

[11]The judge apparently relieved Dion of the necessity of making an offer of proof after the question was excluded. We have assumed that if allowed to answer the witness would have testified to a conversation with Tony that would be favorable to Dion — that Tony threatened Dion with some act of violence.